[No. B170395. Second Dist., Div. Eight. Dec. 13, 2004.]

JAMES D. WEATHERLY, Plaintiff and Appellant, v.
UNIVERSAL MUSIC PUBLISHING GROUP, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*The following parts of the opinion should be published in the Official Reports: Introduction, Factual Background, Procedural Background, Discussion part 1B, and the Disposition.

**COUNSEL**

Spellberg & Kornarens and Anthony Kornarens for Plaintiff and Appellant.

Mitchell Silberberg & Knupp, Russell J. Frackman, Jeffrey D. Goldman and Nicole L. Harris for Defendant and Respondent.

**OPINION**

**COOPER, P. J.**—In this appeal, we reject the argument that an unexercised contractual right to conduct an audit necessarily demonstrates a lack of diligence for purposes of the delayed discovery doctrine. We reverse the award of summary judgment, which the trial court based on a contractual limitations period. We also reverse an order of the trial court sustaining, without leave to amend, a demurrer to Weatherly's cause of action for breach of the implied covenant of good faith and fair dealing.

## FACTUAL BACKGROUND

*The Parties*

Universal-PolyGram International Publishing, Inc. (UPIP) describes itself as a worldwide music publishing company. Universal Music Publishing Group (UMPG), the named defendant and respondent, describes itself as "a fictitious 'umbrella' name for a group of affiliated companies engaged in the business of music publishing, including Universal-PolyGram International Publishing, Inc."

Plaintiff and appellant, James D. Weatherly is a songwriter, who continues to reap the financial benefits of his songs through royalties paid by either UPIP or UMPG. The royalty checks are sent to Gursey, Schneider & Co., where Weatherly's accountant, Stanley Schneider, is employed and is responsible for depositing and handling monies received on Weatherly's behalf. As part of his responsibilities, Schneider cursorily reviewed Weatherly's royalty statements.

*The Royalty Agreement*

In 1974, Weatherly entered into an Exclusive Songwriter's and Composer's Agreement with KECA MUSIC, INC. (Agreement). In the Agreement, KECA MUSIC, INC. (KECA) is referred to as the Publisher and Weatherly is referred to as the Writer. UMPG or UPIP eventually acquired KECA's rights under the Agreement. The parties dispute whether UPIP or UMPG is now the Publisher. That issue was not included in the motion for summary judgment or demurrer, and therefore, we assume only for purposes of this appeal, that UMPG is the Publisher.

The provisions of the Agreement relevant to this appeal are as follows:

(1) Writer is entitled to "[f]ifty per cent [*sic*] (50%) of any and all net sums, after deduction of foreign taxes, actually received (less any costs for collection) by Publisher from sales and uses directly related to subject musical compositions in countries outside of the United States (other than public performance royalties . . . .)"

(2) "Writer shall have the right, upon the giving of at least ten (10) days written notice to Publisher, to inspect the books and records of Publisher, insofar as the same concerns Writer, at the expense of Writer, at reasonable times during normal business hours for the purpose of verifying the accuracy of any transaction or entry relating to the accounting of all sums to which

Writer may have the right to object . . . but no more than once in any one (1) year period during the term hereof."

(3) "All royalty statements and other accounts rendered by Publisher shall be binding upon Writer and not subject to any objection for any reason, unless such objection is specific and is made in writing, stating the basis thereof, and delivered to Publisher within one (1) year from the date of such statement or account, and Writer shall be barred from maintaining or instituting any suit based on such objection unless such suit is commenced within one (1) year after the date on which Publisher notifies Writer that it denies the validity of the objection."

*Royalty Statements*

Weatherly receives a royalty payment and statement twice a year. The royalty statements are in the same format and contain the following information followed by columns of numbers: "Typ[e]," "Catalogue Number," "Units," "Period," "%Rcvd," "Amount received," "Your share," and "Amount due." Most but not all of the entries in the "%Rcvd" column contain the number "100.00."

The meaning of the information in the "%Rcvd" column is disputed by the parties and not explained in the royalty statements or the Agreement. Weatherly interpreted the meaning of "%Rcvd" as the monies received for his songs. Based on the royalty statements he understood UMPG "reported that my share of all income (including foreign income) was being calculated at 100% of all monies received for the songs I wrote." According to Weatherly, "I had no reason to believe there were any problems with UMPG's accountings and never saw anything on the statements that caused me concern." Weatherly's advisors, Schneider and Ali Adawiya, interpreted the royalty statements in the same manner as Weatherly.[1]

According to a statement in UMPG's appellate brief, "The '%Rcvd' column had nothing to do with the existence or amount of any subpublishing

---

[1] Schneider stated, in his declaration, that he understood based on the royalty statements UMPG "reported that Mr. Weatherly's share of all income (including foreign income) was being calculated at 100% of all monies received for the songs he wrote." Schneider testified consistently in his deposition identifying the "% rcvd" column as showing "that Mr. Weatherly's share of all income was being calculated at 100 percent of all monies received for the songs he wrote." Adawiya also reviewed the royalty statements and concluded, "Each of the royalty statements rendered by UMPG from 1990 going forward to Mr. Weatherly are similar in form, content and information. None of them gave me any reason to believe that an off the top fee was being charged or taken on foreign collections, whether by UMPG or any affiliate of UMPG. They all indicate that Mr. Weatherly's 50% share is being calculated on 100% of foreign collections."

fees. Rather, it reflected UPIP's ownership percentage of each individual song, based on whether Weatherly wrote alone or with co-writers."

*The Audit*

In 2001, Weatherly hired Adawiya to audit UMPG's books. Adawiya previously had audited UMPG records on behalf of other clients, and he recommended the audit to Weatherly. In the process of conducting the audit, Adawiya asked Anthony Saragueta, vice-president of royalties for UMPG, "whether they were reporting to Mr. Weatherly 100 percent of the amount received by the foreign companies at the source" and Saragueta responded that it reported "75 percent." According to Adawiya, Saragueta refused to give Adawiya the source documents but told Adawiya that foreign affiliates were taking 25 percent off the top.

Adawiya wrote UMPG, criticizing its accounting practices for the following reason: "local foreign overseas offices reported 100% of the receipts to a ("UM[P]G") main office, called the "HUB," located in the United Kingdom. [*sic*] where then ("UM[P]G") main office in the UK "HUB" kept 25% of the gross income and reported 75% of the income to their offices in the USA. Our contention is that ("UM[P]G") should report the income due to Mr. Weatherly based on the amount actually received by their local foreign offices as stated in the agreement . . . ."

UMPG responded to Adawiya's letter as follows: "[s]ince KECA MUSIC, INC. was a United States corporation and since KECA MUSIC, INC. is defined as Publisher, UMPG is correct in applying a 50% royalty rate to amounts received in the United States. Therefore, there is no basis for this claim."

## PROCEDURAL BACKGROUND

Weatherly filed suit on October 4, 2002. Weatherly claims that UMPG improperly calculated his royalty payments and sued UMPG for rescission, an accounting, open book account, breach of fiduciary duty, constructive fraud, violation of Business and Professions Code section 17200 et seq., breach of contract, and breach of the implied covenant of good faith and fair dealing. The complaint alleges numerous breaches, which concern the collection of royalties, calculation of the amount of the royalties, accounting of royalties, and the failure to provide requested documentation concerning the royalties.

The trial court dismissed the cause of action for breach of the implied covenant of good faith and fair dealing following UMPG's demurrer. The court denied Weatherly's request for leave to amend.

The court granted summary judgment on the remaining causes of action. It found "that there are no triable issues of material fact as to the contractual limitations period set forth in Paragraph 7.2 of the agreement. Plaintiff and Defendant agreed to the shortened limitations period. Planitiff [*sic*] had the right to audit the books at any time but chose to wait until 2001 to do so. The delayed discovery rule does not apply under these circumstances. All causes of action arise from the alleged failure by Defendant to pay royalties to Plaintiff. Thus, the 1-year contractual limitations period bars all causes of action."

Weatherly timely appealed.

## DISCUSSION

I., I.A.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.  *Failure To Conduct an Audit Does not Automatically Show a Lack of Diligence*

UMPG's principal legal argument is as follows: "California case law fully supports the principle that one with the right to monitor another's performance under a contract is charged with the knowledge he would have obtained if he had done so." According to UMPG "[t]he trial court correctly found that Weatherly's decision not to audit precluded him from demonstrating the *blameless* ignorance that is necessary to invoke the 'delayed discovery' doctrine." (Original italics.)

Weatherly argues, among other things, that the statute of limitations and contractual limitations period should be tolled because he provided evidence that UMPG's royalty statements were misleading in indicating that his "50% share was being calculated on 100% of all monies UPMG [*sic*] received . . . ." According to Weatherly, "[i]n addition to improperly keeping 25% to 40% of the amounts due to Weatherly on the royalties collected, UMPG refused to provide requested source documentation from foreign performing rights societies and foreign suspense reports which would show the actual amount of royalties received for the exploitation of Weatherly's work abroad."

■    "The discovery rule protects those who are ignorant of their cause of action through no fault of their own. It permits delayed accrual until a

---

*See footnote, *ante*, page 913.

plaintiff knew or should have known of the wrongful conduct at issue. [Citation.]" (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 832 [195 Cal.Rptr. 421].) A plaintiff, prevented from discovery, should not suffer and a defendant should not "knowingly profit" from the plaintiff's ignorance. (*Id.* at p. 831.) The same policies apply in the context of a contractual limitations provision. (*Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1429 [131 Cal.Rptr.2d 684].) "[N]o authority exists which sanctions a contractual provision permitting parties to opt out of the benefits of the discovery rule in situations where the discovery rule would otherwise apply." (*Id.* at p. 1433.)

There is some authority in support of UMPG's argument that the discovery rule does not apply to a plaintiff who had the means to discover the wrongdoing. (*McKelvey v. Boeing North American, Inc.* (1999) 74 Cal.App.4th 151, 160, fn. 11 [86 Cal.Rptr.2d 645]; *Atlantic Richfield Co. v. Lujan* (N.D.Okla. 1992) 811 F.Supp. 1520, 1525.) Other cases reject the conclusion that the means of inquiry is automatically tantamount to a duty of inquiry. " 'Where no duty is imposed by law to make inquiry, and where, under the circumstances, a prudent man would not be put on inquiry, the mere fact that means of knowledge are open and not availed of does not operate to give constructive notice of the facts.' " (*Baker v. Beech Aircraft Corp.* (1974) 39 Cal.App.3d 315, 321–322 [114 Cal.Rptr. 171]; see also *Prudential Home Mortgage Co. v. Superior Court* (1998) 66 Cal.App.4th 1236, 1248 [78 Cal.Rptr.2d 566] [rejecting argument that delayed discovery did not apply because information available in public records]; *Enterprise-Laredo v. Hachar's* (Tex.Ct.App. 1992) 839 S.W.2d 822, 838 [rejecting an argument that delayed discovery did not apply because the lease in question gave the plaintiff the right to conduct an annual audit].)

In this case, Weatherly's argument goes beyond the claim that a prudent person would not have been put on inquiry notice prior to the audit; he argues that he was misled by the royalty statements, specifically the entries of "100%" in the (% Rcvd) column. Applying the discovery rule in the context of a claim of a misrepresentation, the Ninth Circuit held, under California law, a defendant cannot hinder the plaintiff's discovery through misrepresentations and then fault the plaintiff for failing to investigate. (*El Pollo Loco, Inc. v. Hashim* (9th Cir. 2003) 316 F.3d 1032, 1039 (*El Pollo Loco, Inc.*) [applying California law].) " '[T]he recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he undertaken an investigation.' " (*Id.* at p. 1040, quoting *Storage Servs. v. Oosterbaan* (1989) 214 Cal.App.3d 498, 508 [262 Cal.Rptr. 689].) The court found the limitations period was tolled under the discovery rule where the defendant applied for an El Pollo Loco franchise and provided fraudulent evidence indicating that he was not a franchisee of a competitor. (*Id.* at p. 1035.)

■ The reasoning of *El Pollo Loco, Inc.* is consistent with the purpose of the delayed discovery doctrine: a plaintiff, prevented from discovery, should not suffer and a defendant should not profit from the plaintiff's ignorance. Applied here, the right to conduct an audit is not dispositive of diligence where there is evidence that the plaintiff was "hindered" from discovering the breach by the defendant's misrepresentations. (*El Pollo Loco, Inc., supra*, 316 F.3d at p. 1040.)

I.C., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed. The order sustaining without leave to amend UMPG's demurrer to the cause of action for breach of the implied covenant of good faith and fair dealing is reversed. The case is remanded to the trial court. Weatherly is entitled to his costs on appeal.

Flier, J., and Boland, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 20, 2005. George, C. J., did not participate therein.

---

*See footnote, *ante*, page 913.